

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-26-2006

# USA v. Panaro

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2562

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Panaro" (2006). *2006 Decisions*. Paper 1215.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1215

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No.  05-2562

_____

UNITED STATES OF AMERICA

v.

ANTHONY PANARO,

Appellant

_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Criminal Action No. 02-cr-00064-2)
District Judge: Honorable Gregory M. Sleet

_____

Submitted Under Third Circuit LAR 34.1(a)
March 6, 2006

Before: RENDELL and AMBRO, Circuit Judges,
and SHAPIRO,[*] District Judge

(Opinion filed:  April 26, 2006)

_____

OPINION

_____

AMBRO, Circuit Judge

      Anthony Panaro was convicted by a jury of one count of conspiracy to commit

_____

      [*]Honorable Norma L. Shapiro, Senior District Judge for the Eastern District of
Pennsylvania, sitting by designation.

bank fraud and interstate transportation of fraudulently obtained securities, in violation of 18 U.S.C. § 371, ten counts of interstate transportation of fraudulently obtained securities, in violation of 18 U.S.C. § 2341, and two counts of bank fraud, in violation of 18 U.S.C. § 1344. As a result of those convictions, the United States District Court for the District of Delaware sentenced Panano to 60-month term of imprisonment to be followed by a five-year term of supervised release. He appeals, seeking re-sentencing and arguing that the District Court made a number of clearly erroneous factual conclusions with regard to the Sentencing Guidelines. For the reasons that follow, we affirm.[1]

## I.

Because we are writing for the parties who are familiar with the record and prior proceedings, we recite only those facts relevant to the issues now before us. Panaro operated two companies out of 5161 Woodmill Drive, Wilmington, Delaware: Infinity Mortgage, Inc., a mortgage brokerage entity; and CMB Collections, a collections group. At that same address, Robert Kossak operated KRA (Kossak Richardson Associates) and H. James Childerson practiced law.

Over several years, Panaro, Kossak, and Childerson defrauded lending institutions and/or borrowers in connection with at least 68 loans. Panaro and Kossak prepared false loan applications that often misstated the applicant's income and employment information

---

[1]The District Court had subject matter jurisdiction over this case pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant 28 U.S.C. § 1291.

as well as the type of transaction being financed. Some loan applications also misstated the purchase price of the property and a fraudulent sales contract would be submitted with the application. In the frauds on the lending institutions, Panaro and Kossak were aided by Childerson, who prepared fraudulent settlement sheets and often forged the signature of the borrower.

As indicated above, Panaro was found guilty on all counts. The District Court calculated his Sentencing Guidelines range at 70-87 months and ruled that no downward departures applied. Nevertheless, it concluded that a "reasonable" sentence was 60 months and sentenced Panaro accordingly.

## II.

Panaro raised four objections in the District Court at sentencing that he re-raises here on appeal: (1) he should not have received an upward adjustment for obstruction of justice; (2) the Court's determination that the "loss range" was $350,000 to $500,000 was clearly erroneous; (3) he was entitled to a downward adjustment for acceptance of responsibility; and (4) he should not have received an upward adjustment for "mass-marketing." We address each issue in turn.

### A. *Obstruction of Justice*

Panaro specifically claims that the District Court erred in adjusting his Guidelines sentence two-levels upward under U.S.S.G. § 3C1.1, obstruction of justice, due to his alleged false testimony at trial. We review adjustments under U.S.S.G. § 3C1.1 under a two-part standard: factual determinations for clear error, and legal interpretation and

3

application of the Sentencing Guidelines under a plenary standard. *United States v. Brennan*, 326 F.3d 176, 200 (3d Cir. 2003)

With regard to Panaro's obstruction of justice adjustment, the District Court stated the following at sentencing:

> [A] defendant's denial of guilt is not a basis for this enhancement, unless the denial was under oath and constitutes perjury. After review of Mr. Panaro's testimony at trial, the Court concludes that he, indeed, obstructed justice.
>
> Specifically, the defendant testified that his conduct was not illegal. And that he and his co-defendant were exploiting loopholes of the banking system by paying fees to themselves and by providing false employment verification. He also denied forging any names and stated he never witnessed any forgeries, and always disclosed fees to borrowers and provided explanations as necessary. This testimony was material, and it was substantially contradicted by more credible witnesses at trial, as well as [by] documents. Accordingly, the Court finds Mr. Panaro's obstruction of justice and two-point enhancement is warranted . . . .

The finding that Panaro had obstructed justice by providing false testimony is not clearly erroneous. Section 3C1.1 of the Guidelines mandates a two-level enhancement where the defendant "willfully . . . attempted to obstruct or impede the administration of justice during the course of the . . . prosecution." One recognized way in which a defendant can obstruct justice is by "committing, suborning, or attempting to suborn perjury." U.S.S.G. § 3C1.1 cmt. 4(b). Another is by "providing materially false information." U.S.S.G. 3C1.1 cmt. 4(f) (to a judge or magistrate), (g) (to a law enforcement officer).

Panaro contends he testified at trial that he falsified income, employment and verification documents in order to help people qualify for loans; his trial testimony that he

acted in reliance of the advice of attorney Childerson, while rejected by the jury, was not refuted and, therefore, he did not provide false testimony; and his testimony that he disclosed his fees was consistent with the lack of complaints made about him to the Delaware Bank Commissioner.

The record reveals, however, that most–if not all–of Panaro's trial testimony was rejected by the jury and, in a number of instances, was directly refuted. For example, Panaro testified that he "always disclosed" the fees he charged to the borrower. Moreover, he specifically testified that Jonah and Oga Evans knew and agreed to the use of the "Alan Mowat" letter to indicate the Evanses owed $4,450.66 to CMB Collections. Oga Evans' testimony directly refuted that statement: she stated that she was unaware of the charge.

Panaro also testified that Kevin Hudson agreed to act as a "contractor" in connection with the Richardson loan, and that Hudson asked Panaro to deposit the "contractor's fee" in Panaro's personal bank account. Richardson testified that she had never heard of Hudson. Hudson stated that Panaro had asked him to act as a "contractor" where he would generate "estimates for contracts, getting the check that's cut from settlement, deposit that check . . . and then write a check to the mortgage company and keep $500 for myself." Hudson testified that he refused to be involved and that the documents from the Richardson loan bearing his name were forgeries.

Panaro testified that Hugh McCullough never told him that he did not want a loan prior to the loan closing. McCullough testified that he was unequivocal in saying he did

5

not want a loan. Indeed, a letter sent from Panaro to McCullough supports McCullough's position.

Panaro also testified that Marie Murray first asked for a loan, then cancelled because she did not want to deal with Delta Funding, then asked him to process the loan through a different lender. But Murray testified that, after expressing some initial interest, she told Panaro she did not wish to do business with him. She further testified that she did not authorize him to submit either the Delta Funding or the EquiCredit loan application.

With respect to Panaro's testimony that he relied on Childerston's advice, the record is clear that Childerston was not involved in the initial six loans obtained by fraud. Thus, Panaro's theory that Childerston originated the fraudulent scheme is untrue. In any event, the jury charge stated that good faith was an absolute defense to the charged offense, and that reliance on the advice of counsel was a circumstance indicating good faith. The jury directly rejected this defense, leaving the obvious conclusion that Panaro's testimony was not credible.

Panaro's testimony was both false–as demonstrated by the contrary testimony and documentary evidence discussed above–and material under U.S.S.G. § 3C1.1. If it had been believed by the jury, it would have tended to show that there was no fraud on the borrowers in the loans at issue. Thus, the District Court's finding that Panaro obstructed justice was hardly error, let alone clear error.

**B. Loss Range**

Panaro also contends that the District Court erred in calculating the "loss range" resulting from his crimes. Specifically, he argues that it was a mistake for the Court to calculate loss by treating all monies received in connection with the fraudulently brokered transactions, less "an arbitrarily determined 'reasonable' fee relating to such transactions," because "there was no evidence that fees charged by [Panaro] violated any state or federal laws or regulations or that there was a 'cap' on such charges which was exceeded."

Normally, we review the calculation of loss for clear error. *United States v. Taftsiou*, 144 F.3d 287, 293 (3d Cir. 1998). Panano, however, failed to preserve the loss range argument he now raises on appeal. At sentencing, he objected to the Pre-Sentence Report ("PSR") recommended loss range of $500,000 to $800,000, *see* PSR, Addendum, p. 39 ("The Defendant objects to the loss calculation as being in the $500,000 to $800,000 category, suggesting instead that it should be in the $350,000 to $500,000 category."), and the District Court sustained that objection, later describing its decision to go to the lower range as giving Panaro "the benefit of the doubt." Panaro is now asserting an argument never presented to the District Court, that is, that the $350,000 to $500,000 category is inapplicable. Panaro's failure to raise this point before the Court dictates that we review the loss range calculation for plain error.[2] *See* Fed. R. Crim. P. 52(b).

---

[2]Panaro also fails to inform us precisely what loss range he believes is applicable. He argues that the amount he advocated for in the District Court—$350,000 to $500,000—is inapplicable, but he does not tell us what the range should be instead.

7

Panaro's loss range argument underwhelms in any event. He contends that the District Court's allowance of approximately $3,000 per fraudulent transaction, which it determined that Panano's businesses could have legitimately charged on a non-fraudulent loan, was "arbitrary" (*i.e.*, too low) despite the fact that Carol Kirby of the Delaware Bank Commissioner's Office testified that $3,000 was a reasonable fee for a non-processing broker to charge per legitimate loan. Because there is no cap on broker fees under Delaware law and brokers are allowed to charge up to ten percent of the loan amount under federal law, Panaro deems it error that the District Court only discounted the loss amount by $3,000 per fraudulent loan. In other words, Panaro believes it unjust that the District Court refused to discount the loss amount by ten percent of the sum of the fraudulent loans because, in his view, he was entitled to that kind of fee in exchange for defrauding his customers.

The District Court's calculation of loss range was not plain error, that is, an error that is plain and substantially affects Panaro's rights adversely. *See United States v. Olano*, 507 U.S. 725, 732 (1993). Indeed, it is arguable that the District Court was overly generous in discounting Panaro's loss amount in the first instance by $3,000 because that amount is what the evidence established was a reasonable fee for a *legitimately obtained* loan. Kirby never opined what amount would be a reasonable fee for a *fraudulently obtained* loan. Most likely, that is because no legitimate fee can be earned for helping someone obtain a fraudulent loan, *i.e.*, aiding in the commission of a federal crime. As the Government explains, ruling that Panaro deserved his loss amount discounted by a fee

8

to compensate him for his illegal brokerage activities is akin to saying that an individual who helps in the planning of the bank robbery should enjoy some of the proceeds. Put another way, we would have affirmed the District Court in this case had it decided not to discount the loss amount by any fee amount.

## C. *Acceptance of Responsibility*

Panaro next argues that the District Court erred in denying his request for an adjustment for acceptance of responsibility pursuant to § 3E1.1 because, while he "proceeded to trial to advance a defense of reliance on the advice of counsel, he did not deny the essential factual elements of the crimes charged." As stated above, "[w]hen reviewing the imposition of a sentence under the federal sentencing guidelines, the District Court's findings of facts are measured by the clearly erroneous test, but our review of the legal component of its conclusion is plenary." *United States v. Bennett*, 161 F.3d 171, 190 (3d Cir. 1998) (internal quotations omitted).

Under § 3E1.1(a) of the Sentencing Guidelines, a defendant who "clearly demonstrates acceptance of responsibility for his offense" is entitled to have his offense level decreased by two levels. A defendant may have his offense level decreased by one additional level if: he qualifies for the two-level reduction under subsection (a); the offense level is 16 or greater prior to the operation of subsection (a); and he assisted authorities by (1) "timely providing complete information to the government regarding his role in the offense," or (2) "timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting

the court to allocate its resources effectively." U.S.S.G. § 3E1.1(b).

Application note 2 to § 3E1.1 states that the acceptance of responsibility adjustment ordinarily does not apply to a defendant who puts the Government to its burden of proof at trial. *See* U.S.S.G. § 3E1.1 cmt. 2. Conviction subsequent to trial, however, is not an absolute bar from consideration of the reduction.

> In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

*Id*. Panaro was convicted, *inter alia*, of bank fraud and interstate transportation of stolen property. He did not admit to all of the elements of those crimes at trial. Indeed, he has repeatedly asserted that he did not possess the requisite mental state to commit the offenses. There is no question that intent is a factual element of each of the offenses charged, and thus the Government was obligated to prove Panaro's intent beyond a reasonable doubt. In this context, the District Court's finding that "Panaro clearly has not accepted responsibility for his crime" cannot amount to clear error.

## D. *Mass-Marketing*

Section 2F1.1(b)(3) of the 2005 version of the Sentencing Guidelines provided for a two-level enhancement in the offense level calculation where the offense was committed via "mass-marketing." U.S.S.G. § 2F1.1(b)(3) (2000), *recodified at* U.S.S.G. § 2B1.1(b)(2) (2005). According to application note 3 of the 2000 version of § 2F1.1,

10

"mass-marketing"

> means a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit. "Mass-marketing" includes, for example, a telemarketing campaign that solicits a large number of individuals to purchase fraudulent life insurance policies.

U.S.S.G. § 2F1.1(b)(3) cmt. 3 (2000), *recodified at* U.S.S.G. § 2B1.1(b)(2) cmt. 4(A) (2005). Panaro concedes that "he used telemarketing, a 'lead machine,' and twelve to thirteen telemarketers at one time in his business," yet argues that the enhancement does not apply because the record evidence establishes that he did not solicit a "large number" of victims via his telemarketing efforts. We review the District Court's application of the Guidelines to the facts for an abuse of discretion. *Buford v. United States*, 532 U.S. 59, 63-66 (2001).

The Government contends that the record establishes that thirteen of Panaro's forty-nine victims found out about Infinity Mortgage, Inc., through mass-marketing. The number of actual victims, however, is not relevant under the plain meaning of § 2F1.1(b)(3). *See United States v. Pirello*, 255 F.3d 728, 732 (9th Cir. 2001) (upholding mass-marketing enhancement when there were only three victims). Here, it is uncontroverted that Panaro used telemarketing in furtherance of his criminal activity. Moreover, application note 3, which clearly states that the enhancement applies to "conduct[ing] . . . a telemarketing campaign that *solicits* a large number of individuals to purchase fraudulent [goods or services]," supports the conclusion that the enhancement

11

applies to a plan soliciting a large number of victims to buy into the scheme rather than the number actually induced. U.S.S.G. § 2F1.1(b)(3) cmt. 3 (2000) (emphasis added). Therefore, Panaro's actions represent the precise type of conduct contemplated by the former § 2F1.1(b)(3).

\* \* \* \* \*

For the reasons provided above, we affirm the sentence imposed by the District Court.